NOT DESIGNATED FOR PUBLICATION

No. 125,103

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.M.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; RICHARD A. MACIAS, judge. Opinion filed December 9, 2022. Affirmed.

*Anna M. Jumpponen*, of Wichita, for appellant natural father.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL and SCHROEDER, JJ.

PER CURIAM: J.M.'s natural father timely appeals the district court's decision to terminate his parental rights. Father asserts the district court erred in finding he was unfit and that his unfitness would continue into the foreseeable future. He also claims the district court erred in finding termination of Father's parental rights was in J.M.'s best interests. After carefully reviewing the record and the parties' arguments, we find that when viewed in the light most favorable to the State, the evidence supports the district court's order to terminate Father's parental rights and doing so was in J.M.'s best interests. We affirm.

1

FACTS

J.M. was born in 2011. When J.M. was about six years old, Mother filed a protection from abuse (PFA) petition against Father; Father left the home never to return. The PFA petition was never granted. As time passed, Father's contact with J.M. decreased and became less frequent.

In April 2019, the State petitioned the district court to find that J.M. was a child in need of care (CINC). The petition alleged Mother had not been taking J.M. to school and was using drugs, putting J.M. in a dangerous situation. The district court granted an ex parte order placing J.M. in the custody of the Kansas Department for Children and Families (DCF). Before this case was filed, DCF had been involved in seven prior intakes with J.M. and his parents.

The district court held a temporary custody hearing the next day and ordered that J.M. remain in the temporary custody of DCF until the agency determined reintegration was safe. Father appeared at this hearing and admitted his paternity; the district court ordered him to pay $25 per month in child support. However, the record reflects Father never paid any child support through the course of the proceedings.

On the same day as the temporary custody hearing, Father submitted a urinalysis (UA) sample that was positive for cocaine, methamphetamines, and amphetamines. A caseworker from Saint Francis Ministries—the agency contracted to oversee J.M.'s case—also requested a hair follicle sample from Father, but he refused. Father submitted two more UA samples over the next several weeks that were negative for illegal drugs.

At a disposition hearing in June 2019, the district court adjudicated J.M. a child in need of care. In early July, Father's hair follicle test was positive for cocaine. Through the end of 2019 and into early 2020, he submitted to more drug tests with differing results.

2

Seven UA tests were negative, interspersed with two positive tests for cocaine; one hair follicle test was positive for methamphetamines and cocaine; and four hair follicle tests were either insufficient or he refused to submit when requested.

In October 2019, the district court held a permanency hearing with Father present and found reintegration continued to be a viable goal. Father also appeared at a review hearing in early 2020, and the district court recognized some progress during this period, despite the positive drug tests. Saint Francis reported Father was making "good progress with getting his orders completed"; he had completed a substance abuse evaluation, a clinical assessment, and parenting classes. His substance abuse evaluation did not recommend any treatment. His clinical assessment revealed he met some criteria for narcissistic personality disorder and antisocial personality disorder. The evaluator recommended Father complete an in-depth parenting class and participate in family therapy with J.M. Father denied his drug use during this evaluation—which would have affected the evaluator's recommendations—even though his tests reflected drug use.

After leaving the family home, Father moved into a small one-bedroom apartment with no room for J.M. Then Father moved in with a friend for a while before obtaining his own two-bedroom apartment with a separate room for J.M. Father worked as a laborer for his friend. However, Saint Francis told him his job was insufficient because he did not receive pay stubs. Father quit and found a new full-time job as a welder working the third shift—overnight from 7:30 p.m. to 6 a.m.—making over $20 per hour. Saint Francis also praised Father for doing "an excellent job communicating with his case team."

As J.M.'s case approached the one-year mark in spring 2020, Father's drug testing continued to undermine his ability to parent J.M. He did not complete any testing in March or April, submitted two negative urine samples in May, and then failed to complete UA and hair follicle tests in June. Father completed a domestic violence

assessment during this period, which did not recommend a Batterer's Intervention Program.

In June 2020, a federal grand jury indicted Father for possession with intent to distribute methamphetamine, heroin, and cocaine, plus possession of a firearm in furtherance of a drug-trafficking crime and possession of a firearm by a prohibited person. The indictment alleged the crimes were committed in January 2020 while J.M.'s case was pending. Along with these new federal charges, Father still faced pending state charges for crimes he allegedly committed in 2018 for possession of an opiate, cocaine, and another controlled substance. Father's criminal history was significant. Before J.M. was born, Father had spent over 10 years in prison for drug-related convictions.

The district court held a permanency hearing in September 2020 and determined reintegration was no longer viable for either parent. In October 2020, the State moved to terminate Father's and Mother's parental rights. As to Father, the State alleged he was unfit because of his positive drug tests, his pending criminal charges, his failure to complete court orders, and his inability to take on parenting duties.

Over the next few months, Father submitted multiple UA samples that were either negative or positive only for his prescription, but he failed to comply with one requested test. However, his hair follicle tests continued to be positive for drugs other than his prescription. A week after the State filed its termination motion, Father returned a hair follicle test positive for cocaine. The next test, in January 2021, was positive for amphetamine, methamphetamine, benzoylecgonine, and cocaine. Despite these positive tests, Father denied any drug use and suggested to caseworkers his positive test could have resulted from touching money and then touching his moustache, where the hair follicle sample came from.

4

Father's positive tests throughout the case restricted his weekly visits, which remained between one to two hours with J.M. at places like bookstores and malls. Father never earned longer or more frequent visits with J.M. because of his drug test failures.

Father's visits with J.M. generally went well and their relationship was good, despite the infrequent contact and his missed visits. The Saint Francis caseworkers who worked on J.M.'s case all agreed Father and J.M. had a good relationship, but it was more of a friendship than one of a parent and his child. Caseworkers were troubled by Father's failure to implement the parenting skills he had been taught during his parenting classes.

In March 2021, Mother was murdered just prior to the termination hearing. Father was left as the only remaining natural parent and the only available reintegration option for J.M. Father helped caseworkers tell J.M. about his mother's death, and he brought J.M. flowers. In the weeks after Mother's death, Father failed to complete two requested hair follicle tests and was late to a visit with J.M. because he overslept.

The district court held the termination hearing over two days in April and June 2021. When the hearing began, J.M.'s case had been ongoing for two years with little progress by Father. J.M. was now nine years old. The first witness to testify was J.M.'s therapist. She explained J.M. had attention deficit hyperactivity disorder and needed stability—especially after Mother's recent death. She was also concerned Father never scheduled to start the family therapy she recommended over a year earlier.

Father testified and discussed his progress with employment, housing, parenting classes, and other tasks. Father's federal and state criminal cases were both still pending, and, when asked about them, Father was not sure what his charges were and testified he had not viewed the indictment. He explained he was innocent of all pending charges but, if he were convicted of anything, he hoped his family members would step in to care for J.M. He stated J.M.'s maternal grandfather and Father's adult son would help but admitted

5

he had not yet asked for their help. Father testified he would begin the court-ordered family therapy with J.M.

Father testified that he had stopped using drugs and "fired" his friends who used drugs. He told the district court he would pass a hair follicle test and explicitly asked the court to order one that day. The district court did, and Father's hair follicle test was positive for cocaine, benzoylecgonine, norcocaine, p-hydroxycocaine, and o-hydroxycocaine. Despite this positive test, Father continued to deny drug use, asking a caseworker if his positive test could have been caused from having sex with multiple drug users.

Two months passed between the first day of the termination hearing and the second day of the hearing. During these two months, Father submitted two UA samples that were positive for his prescription drug, and he did not comply with one requested UA test. Father also began family therapy with J.M. after the first day of the hearing, attending multiple sessions but also no-showed once. The therapist noted Father and J.M. enjoyed spending time together, but they struggled to connect, "including in the area of nurturing and developmentally appropriate challenge."

The district court held the second day of the termination hearing in June 2021. For the first time, Father admitted using drugs and suffering from addiction. He testified he had used cocaine as recently as a month earlier. But later in the hearing, Father contradicted this testimony and stated he had not used cocaine since before the first day of the hearing. Father started outpatient drug treatment a week before the June 2021 hearing and began his third parenting class.

On this second day of hearing, Father's pending federal and state criminal cases both remained unresolved, and Father maintained he would not be convicted in either one. In the months since the first hearing, Father still had not talked to potential

caregivers about caring for J.M. if Father were incarcerated, but he continued to assert J.M.'s maternal grandfather and Father's adult son would do it. Father still had not made any arrangements for J.M.'s care while he worked nights but testified he would try to change shifts or get a babysitter if he got custody of J.M.

J.M.'s various caseworkers also testified. They generally agreed Father and J.M. had a good relationship and Father had made some progress with tasks, but he had stalled his own progress by continuing to test positive for drugs. Indeed, every hair follicle test Father completed during the case had been positive. Father did not tell Saint Francis he had started drug treatment until that day. The caseworkers were concerned Father was not implementing the parenting skills he had learned, despite taking three parenting classes. According to his reintegration supervisor, this was symptomatic of an overall lack of "secondary change"—that is, going beyond just checking boxes to implementing the changes and skills he obtained through reintegration tasks. Saint Francis, even with some of Father's successes, still recommended terminating Father's parental rights because J.M. needed stability in his life.

The district court took the matter under advisement and issued its order terminating Father's parental rights the next month. The district court made extensive factual findings and based its termination order on four statutory factors:

- K.S.A. 38-2269(b)(3)—drug use that rendered Father unable to care for J.M.;
- K.S.A. 38-2269(b)(5)—conviction of a felony and imprisonment;
- K.S.A. 38-2269(b)(7)—failure of reasonable efforts by Saint Francis and the State; and
- K.S.A. 38-2269(b)(8)—lack of effort to adjust his circumstances to meet J.M.'s needs.

7

In making its findings, the district court explained it did not find Father's testimony and explanations credible. The district court also found Father's unfitness was unlikely to change in the foreseeable future and it was in J.M.'s best interests to terminate Father's parental rights. Additional facts will be added as needed.

ANALYSIS

A parent has a constitutionally protected liberty interest in the relationship with his or her child. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus, before terminating parental rights, Kansas law requires a district court to find the State has proved the parent is unfit, the conduct or condition rendering the parent unfit is unlikely to change in the foreseeable future, and termination of parental rights is in the child's best interests. K.S.A. 38-2269(a), (g)(1). Because of the fundamental nature of this right, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, 1113, 336 P.3d 903 (2014).

When reviewing a finding of parental unfitness, we must determine, after considering all the evidence in a light most favorable to the State, whether the evidence is clear and convincing to support the district court's decision—that is, whether a rational fact-finder could have found it highly probable that the parent was unfit. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

*Clear and Convincing Evidence Supports the District Court's Unfitness Findings*

The district court found Father unfit under K.S.A. 38-2269(b)(3), (b)(5), (b)(7), and (b)(8). A valid finding under any of these factors on its own "may, but does not

8

necessarily, establish grounds for termination of parental rights." K.S.A. 38-2269(f). Father claims the district court's unfitness findings are not supported by the evidence.

*Father's continued drug use*

This factor requires the evidence to show more than just a parent uses drugs; it must show the drug use has made the parent unable to the meet the child's needs. *In re K.H.*, No. 121,364, 2020 WL 2781685, at *8 (Kan. App. 2020) (unpublished opinion). The district court's finding is supported by clear and convincing evidence. Here, Father was unfit because of drug use of such duration or nature as to render him unable to adjust his conduct to care for the ongoing physical, mental, or emotional needs of J.M. See K.S.A. 38-2269(b)(3).

The record reflects Father's drug use was consistently a problem and he failed to address it. Father finally acknowledged his problem on the second day of the termination hearing. From the start, Father regularly submitted positive drug tests—mostly for cocaine, along with some tests that were positive for methamphetamines and other substances. In fact, every hair follicle test he submitted was positive, including one he submitted *after* the first day of the termination hearing. He also regularly failed to submit to requested hair follicle and UA tests. And while some of Father's UA tests were clean, the positive hair follicle tests consistently undercut them, especially given the fact cocaine is detectable in urine for a shorter period of time after use than from a hair follicle.

Despite his many positive tests, Father denied using drugs and suggested to caseworkers his positive results came from things like touching money or having sex with drug users. Father's testimony about how recently he had used cocaine was inconsistent. Father did not seek treatment until a week before the second day of the hearing. While Father claimed he was no longer using and was committed to his

9

treatment, the district court did not find his testimony credible—a finding we must accept. See *In re B.D.-Y.*, 286 Kan. at 705.

The evidence showed Father's drug use restricted his ability to visit J.M. and take on more parenting duties. During the two years the case was pending, Father's parenting time was limited to one or two hours per week. Father's continued positive drug tests prevented longer or more frequent visits. Father failed to change his behavior for J.M.'s benefit.

The district court determined the two-plus years of positive drug tests and failing to acknowledge his drug use outweighed Father's late progress. Father now asks us to reweigh this evidence, which we cannot do. See 286 Kan. at 705. The district court's unfitness finding under K.S.A. 38-2269(b)(3) is properly supported by clear and convincing evidence.

*Failure of reasonable efforts by the agencies and Father's lack of effort*

The district court also found Father was unfit due to "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." K.S.A. 38-2269(b)(7). Father claims Saint Francis did not make reasonable rehabilitation efforts because it only allowed weekly one- or two-hour visits throughout the case, and none of the visits were at Father's home.

Father's caseworkers regularly communicated with him throughout the case and tried to steer him toward completing tasks. Father's failure to progress past short weekly visits was not because of any deficiency on Saint Francis' part; it was because Father kept testing positive for drugs and was not working the programs required to reintegrate J.M. back into his home. Father had an opportunity to change, but, for whatever reason, he did not.

10

Clear and convincing evidence supports the district court's finding under K.S.A. 38-2269(b)(7). Saint Francis made reasonable reintegration efforts, but those efforts failed because Father continued to use drugs and failed to implement meaningful changes. The record supports the district court's finding Father was unfit despite the agency's reasonable rehabilitation efforts.

The district court also found Father unfit because of a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 38-2269(b)(8). Father asserts the evidence did not support this finding because he made significant progress during the case, such as taking multiple parenting classes, obtaining steady employment and housing, planning for J.M.'s care, and was seeking drug treatment and family therapy.

Most notably, Father lacked any effort to confront his drug use until a week before the final day of the termination hearing. Before that, he consistently denied using drugs to caseworkers and the district court, despite his positive tests. And on the first day of the termination hearing, he testified that he had "fired" his friends who used drugs and was clean. But the test he took that day was positive. His positive tests reflect he was still using drugs and failed to adjust his behavior to meet the needs of J.M.

The record reflects Father had pending federal and state criminal charges and he failed to develop a plan for J.M.'s care should he be convicted and sentenced to prison. He had not done so on the first day of the termination hearing, and he still had not done so on the second day of the hearing two months later. Father's answers about how he would ensure J.M.'s care while he worked nights were inconsistent and lacked a clear care plan. Father attended multiple parenting classes, but the caseworkers failed to see him implement the parenting skills he was taught.

11

While Father made some progress during the case, it came too late to outweigh the other evidence the district court considered. Again, we do not reweigh evidence. *In re B.D.-Y.*, 286 Kan. at 705. Clear and convincing evidence supports the district court's conclusion Father was unfit because of his lack of effort to change his circumstances to meet J.M.'s needs. See K.S.A. 38-2269(b)(8).

*Conviction of a felony and imprisonment*

The district court also found Father unfit for "conviction of a felony and imprisonment." K.S.A. 38-2269(b)(5). For its finding under this factor, the district court relied on a combination of Father's past felony conviction and prison sentence—which he completed before J.M. was born—and his pending charges.

While the statute has no language stating whether or when a past conviction and completed sentence of imprisonment can render a parent unfit, the inquiry in a termination proceeding is whether the parent is *presently* unfit. See K.S.A. 38-2269(a); *In re L.D.*, No. 119,613, 2019 WL 257979, at *2 (Kan. App. 2019) (unpublished opinion). It is unclear how Father's past conviction and sentence—which were over 10 years old and completed before J.M.'s birth—rendered him unfit at the time of the termination hearing.

Father's past conviction may be relevant to other considerations, such as his lack of effort to change his circumstances, given the new federal charges filed for alleged drug activity after this case was filed. However, there is no evidence supporting a finding here as an independent basis for termination under K.S.A. 38-2269(b)(5). His prior felony conviction predated J.M.'s birth, and there was no evidence presented that Father's prior conviction independently rendered him an unfit parent. Still, a valid finding under any factor on its own can support termination, and clear and convincing evidence supports the district court's unfitness findings under the other factors it relied on. See K.S.A. 38-2269(f).

*The Conduct or Circumstances Rendering Father Unfit Were Unlikely to Change in the Foreseeable Future*

A court evaluates the foreseeable future from a child's perspective because children have a different perception of time. *In re R.S.*, 50 Kan. App. 2d at 1117. For a child, "a month or a year seem[s] considerably longer than it would for an adult." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019); see K.S.A. 38-2201(b)(4). A court may look to a parent's past conduct as a predictor of the foreseeable future. *In re M.S.*, 56 Kan. App. 2d at 1264; *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

J.M.'s case lasted over two years. He was 7 years old when it began and nearly 10 years old when the district court terminated Father's parental rights. And before this case began, J.M. was involved in multiple DCF intakes starting when Mother was pregnant with him.

Despite the opportunities provided to Father, he did little to address the main concerns preventing reintegration. He consistently tested positive for drugs and did not admit to drug use until just before the last day of the termination hearing. Given this history, Father's last-minute decision to enter outpatient treatment did not support a finding his drug usage was likely to change in the foreseeable future. The district court did not find Father's promises of lasting change credible.

Based on this case's long history and J.M.'s age, clear and convincing evidence supports the district court's finding that Father's unfitness was unlikely to change in the foreseeable future. A contrary finding would require this court to reweigh the evidence and reassess witness credibility, which we cannot do. *In re B.D.-Y.*, 286 Kan. at 705.

*The District Court Did Not Abuse Its Discretion in Finding Termination of Father's Parental Rights Was in J.M.'s Best Interests*

Father asserts it was error for the district court to terminate his parental rights in J.M.'s best interests. He argues he and J.M. had a strong relationship, good visits, and it was in J.M.'s best interests to maintain a bond with his Father after Mother's death.

When making a best-interests determination, the district court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). We review this finding for an abuse of discretion. *In re M.S.*, 56 Kan. App. 2d at 1264. A court abuses its discretion when no reasonable person would agree with the decision or when the court bases its decision on a legal or factual error. *In re R.S.*, 50 Kan. App. 2d at 1116.

J.M.'s therapist testified J.M. needed stability—especially after Mother's death. The therapist also noted J.M. had been "in limbo" for a long time and deserved a nurturing and consistent caregiver. Throughout the case, Father's lack of effort cast doubt on his ability to be there for J.M. Saint Francis caseworkers echoed the therapist's stability concerns and did not believe Father, given his past actions, could provide stability for J.M.

The record supports the district court's decision. Given the totality of the circumstances, a reasonable person could agree with the district court's finding that termination was in J.M.'s best interests.

Affirmed.